**DeMont R.D. CONNER,
Plaintiff-Appellant,**

v.

**Theodore SAKAI et al., Defendants-Appellees.**

No. 91–16704.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 5, 1992 *.

Decided June 2, 1993.

---

* The panel unanimously finds this case suitable for submission on the record and briefs without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 34–4.

**1410**

DeMont R.D. Conner, pro se.

John Campbell, Jr., Frank D.J. Kim, Deputy Attys. Gen., Honolulu, Hawaii, for defendants-appellees.

Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

DeMont R.D. Conner, a Hawaii state prisoner serving a thirty-years-to-life sentence, appeals pro se the district court's grant of the state's motion for summary judgment, and the district court's denial of his cross-motion for summary judgment, on his § 1983 suit against a number of prison officials [1] and the State of Hawaii. We reverse, as to certain of the defendants, the district court's grant of summary judgment in the state's favor on certain of Conner's claims: that he was improperly subjected to disciplinary segregation, that he was punished for praying aloud in Arabic with a fellow inmate, and that he was denied access to the law library or to persons trained in the law. We affirm the remainder of the district court's order, including the denial of Conner's cross-motion for summary judgment.

### I.

#### A. State's Motion for Summary Judgment

##### 1. Sovereign Immunity

The state correctly contends that the eleventh amendment bars Conner's suit against the State of Hawaii, *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), *Quern v. Jordan*, 440 U.S. 332, 338–41, 99 S.Ct. 1139, 1143–45, 59 L.Ed.2d 358 (1979),[2] and Conner's suit against the other defendants in their official capacities, *Hafer v. Melo*, —— U.S. ——, —— 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991). However, the eleventh amendment does not bar Conner's suit against the other defendants in their personal capacities. *Id.* —— U.S. at ——, 112 S.Ct. at 362.

##### 2. Disciplinary Segregation

Conner contends that the disciplinary segregation imposed on him after a hearing on August 28, 1987, violated his right to due process. He asserts that, before the hearing, he was not given a summary of the facts leading to the charges, that he was not per-

---

**1.** The named defendants are Theodore Sakai, Acting Administrator, Department of Institutions; Harold Falk, Director of Corrections; and several administrators of the Halawa Correctional Facility: Lawrence Shohet, Corrections Supervisor; William Oku, Administrator; Leonard Gonsalves, Chief of Security; Cinda Sandin and Francis Sequeira, Unit Team Managers; and seven Adult Corrections Officers (ACOs), William Summers, Robert Johnson, Gordon Furtado, Abraham Lota, Edward Marshal, William Paaga, and Brian Lee.

**2.** Conner claims that the State has waived its immunity through Haw.Rev.Stat. § 662–2. However, this section waives the state's immunity only as to tort suits. Conner does not make out a tort claim.

mitted to question the guard who charged him with the offense, that he was not allowed to call witnesses at the hearing, and that his testimony was "doctor[ed]" and used against him. We agree that Conner has presented a genuine issue of material fact as to whether his hearing comported with due process.

■ The first issue we face is whether Conner had a liberty interest, protected by the fourteenth amendment, in not being arbitrarily placed in disciplinary segregation. The fourteenth amendment protects liberty interests arising from the Due Process Clause or created by state law. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). To discover whether state law has created a liberty interest, we must "examine closely the language of the relevant statutes and regulations" to see whether the state has placed "substantive limitations on official discretion." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (internal quotation omitted; citation omitted). Most commonly, a state fetters official discretion by a two-step process. First, the state establishes "substantive predicates" to govern official decisionmaking. These are "particularized standards or criteria to guide the State's decisionmakers." *Id.* Next, the state requires, in "explicitly mandatory language," that if the substantive predicates are met, a particular outcome must follow. *Id.* at 1909–10, 109 S.Ct. at 463. We conclude that Hawaii's regulations create a liberty interest in remaining free from disciplinary segregation. The regulations provide explicit standards that fetter official discretion. Under Title 17, subtitle 2 (Corrections Division), Department of Social Services and Housing, § 17–201–18(b) ("§ 17–201–18(b)"), the inmate must admit guilt or the prison disciplinary committee must be presented with substantial evidence before the committee may make a finding of guilt. If the inmate does not admit guilt, or the committee does not find substantial evidence, the particular outcome—freedom from disci-

plinary segregation—must follow. § 17–201–18(b).

Having found that Conner possessed a liberty interest in not being confined to disciplinary segregation, we now proceed to the issue whether he was afforded sufficient process before being so confined.

*i. summary of facts*

■ Under the Due Process Clause, an inmate facing a disciplinary hearing must be given advance notice of the hearing. *Wolff v. McDonnell,* 418 U.S. 539, 563–65, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974). Even if state administrative regulations supply additional process due to inmates of Hawaiian prisons, *see* § 17–300–3 *et seq.,*[3] and even if inmates may sue to enforce such regulations in federal court, there is no genuine issue of material fact as to whether Conner was given the opportunity to review the facts and other materials supporting the charge against him. The record contains a form, apparently signed and dated by Conner, that recites the charge against him and states, "Facts supporting the charge(s) are as stated on the attached Misconduct Report." Because Conner does not contest that he signed and dated the form or that the misconduct report was attached, and does not otherwise dispute the authenticity of the form, he has failed to show that a genuine issue of material fact exists as to this contention. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.Proc. 56(c).

*ii. cross-examination*

■ No genuine issue of material fact exists as to Conner's contention that he was not permitted to cross-examine the guard who charged him with misconduct. The Due Process Clause does not require prison administrators to afford inmates such a right. *Wolff v. McDonnell,* 418 U.S. at 567–69, 94 S.Ct. at 2980–81. Even if state regulations may be enforced in a case such as this, Hawaii has

---

**3.** Section 17–201–16(c) requires that an inmate be given an opportunity to review all relevant non-confidential reports of misconduct or a summary of such reports between the time the inmate receives notice of the hearing and the hear-

ing itself. Section 17–201–16(d) provides that the misconduct reports or summary "shall contain" a description of the specific rule alleged to have been violated, the facts that support the charge, and the names of witnesses.

not created a due process right to cross-examine witnesses at a disciplinary hearing.[4]

### iii. alteration of testimony

■ Conner has not raised a genuine issue of material fact to support his contention that his testimony at his hearing was doctored. His affidavits do not disclose the alterations allegedly made. Bare allegations do not suffice to defeat a motion for summary judgment; Conner's obligation, rather, was to relate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2552.

### iv. witnesses

Under *Wolff v. McDonnell*, an inmate "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. The state's regulations, even if applicable, do not expand on this right.[5] A genuine issue of material fact exists as to Conner's contention that he was not permitted ·to call witnesses at his hearing. · The record contains a form, apparently distributed to Conner after the hearing, that states that witnesses were unavailable at the hearing "due to the move to the medium facility and being short staffed on the modules."

■ Prison disciplinary committees may not deny a defendant the right to call important witnesses solely for the sake of administrative efficiency. *Bostic v. Carlson*, 884

F.2d 1267, 1273 (9th Cir.1989). Rather, they must show the adequacy of their justification for denying a request to present witnesses in a disciplinary proceeding. *Id.* Further, we note that "[t]he security issues that concerned the *Wolff* Court were the risk of death or injury to inmate witnesses and informants identified at hearings or in produced documents, as well as the potential for breakdown in authority, order and discipline inside the institution." *Young v. Kann*, 926 F.2d 1396, 1400 & nn. 8, 9 (3d Cir.1991). It is not clear that these were the concerns that motivated the disciplinary committee that considered Conner's case.

■ In the context of· a motion for summary judgment, the prison's burden to show the adequacy of its justification for denying an inmate the right to present witnesses at his hearing is the one it would bear in a motion for a judgment as a matter of law (directed verdict) under Fed.R.Civ.Proc. 50(a). *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552. Such a burden requires that the evidence "permit[ ] only one reasonable conclusion as to the verdict." *McGonigle v. Combs*, 968 F.2d 810, 816 (9th Cir.1992), *cert. denied sub nom. Casares v. Spendthrift Farm, Inc.*, —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). In stating without more that "witnesses were unavailable due to [the] move to the medium facility and being short staffed on the modules," the state has not met its affirmative burden.

■ Conner links only Defendant Sandin to the denial of his right to call witnesses.[6]

---

4. Under § 17–200–16(c), the prison may decline to permit the inmate to cross-examine witnesses at a disciplinary hearing. It states that the inmate "may" be given the opportunity to confront and cross-examine adverse witnesses unless, in the judgment of the disciplinary committee, such a confrontation would

    (A) Subject the witnesses to potential reprisal;
    (B) Jeopardize the security or good government of the facility;
    (C) Be unduly hazardous to the facility's safety or correctional goals; or
    (D) Otherwise reasonably appear to be impractical or unwarranted.

§ 17–200–16(c)(2). If the inmate is not permitted to confront or cross-examine adverse witnesses, the disciplinary committee "is encouraged" to record the reason for the denial and to

explain the reason to the inmate. § 17–200–16(c)(3).

5. The state's regulations track *Wolff v. McDonnell, supra*, in stating that the inmate "should" be given the opportunity to call witnesses "as long as it will not be unduly hazardous to institutional safety or correctional goals." § 17–200–16(f)(1). Reasons for denial of such an opportunity are irrelevance, lack of necessity, the hazards presented in the individual case, and "any other justifiable reason." § 17–200–16(f)(2).

6. In his affidavit of May 17, 1988, Conner states: "On August 28, 1987, Defendant Cinda Sandin did violate my right to due process when she denied me the right to question the correctional officer whom had written me up, and to review the submitted reports, and to call witnesses."

The state claims that all of the defendants, including Defendant Sandin, are protected by qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987); *Erickson v. United States,* 976 F.2d 1299, 1301 (9th Cir.1992). Under the doctrine of qualified immunity, the issue is whether the right infringed was clearly established at the time of the defendant's complained-of action, and whether a reasonable official could have believed that his or her actions did not violate that right. *Anderson v. Creighton,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40. The right to call witnesses at a disciplinary hearing has been clearly established since *Wolff v. McDonnell* was decided in 1974. Whether a reasonable official could have believed his actions in denying Conner the requested witnesses were lawful is a matter that cannot be decided without a fuller development of the record.

Accordingly, summary judgment as to Conner's claim regarding disciplinary segregation is reversed with respect to Defendant Sandin.[7]

### 3. Prayer in Arabic

Conner alleges that his first and fourteenth amendment rights were violated when prison officials punished him for praying aloud in Arabic. He was punished for violating a prison rule that requires inmates to "communicate in the English language only; including telephone calls, visits, and letters." Conner contends that as a Muslim he must say his prayers in Arabic and that he must say them aloud; that on February 1, 1989, he was a recent convert to Islam and had only begun to learn Arabic; and that on that day he was praying aloud in Arabic in unison with a more experienced fellow inmate when Defendants Paaga and Lee ordered the two men to speak in English only. When Conner

refused to comply, Defendant Paaga issued a misconduct report, which led to Conner's confinement in disciplinary segregation for fourteen days. In addition to Defendants Paaga and Lee, Conner seeks relief from Defendants Oku, Sakai, and Falk for the deprivation of due process he claims to have suffered.

■ Construing the facts most favorably to Conner, as we must on a motion for summary judgment, *see Leer v. Murphy,* 844 F.2d 628, 631 (9th Cir.1988), we assume that Conner was punished after refusing to stop praying in Arabic.[8] It is a fundamental element of due process that conduct may be punished under a rule only if that rule proscribes the conduct. It seems clear that the prison's English-only rule does not apply to prayer. We believe that the plain meaning of the rule forbids the non-English interchange of information between or among humans, not between humans and their gods. If the rule were intended to apply to "communication" with divine beings, certainly the term "prayer" would have been used. Nor do the examples provided in the rule—telephone calls, visits, and letters—suggest a more holy meaning.

■ In addition, even if the interpretation of the rule could be stretched to include prayer, we would hold that the due process clause forbids the implementation of such a construction. The due process clause bars the state from imposing punishment on the basis of an unexpected and unusual interpretation of plain language. *See Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). The language of the English-only rule on its face clearly proscribes only inter-personal communication, and the examples accompanying the rule reinforce such a reading. Had the state desired to proscribe praying aloud, language clearly proscribing such conduct could

---

7. Conner also contends that no evidence supported the disciplinary committee's finding of guilt. However, he has not supported his contention with an affidavit or a verified complaint.

8. The misconduct report states that Conner was punished for refusing to obey Defendant Paaga's

order. However, because Defendant Paaga's order was to stop speaking in a foreign language, we consider whether, under the Due Process Clause, Conner may be punished for violating the underlying rule.

have been included in the rule.[9] *See United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1540, 91 L.Ed. 1877 (1947) (upholding a law against a void-for-vagueness challenge because no "clearer and more precise language.... occurs to us, nor has any better language been suggested, effectively to carry out what appears to have been the Congressional purpose"). The interpretation of the English-only rule sought by the state would be most unexpected and highly unusual. Therefore, the rule cannot be constitutionally applied to the conduct at issue here: it gives inmates insufficient notice that they are forbidden to pray in a foreign language.

■■■ Conner does not proximately connect Defendants Oku, Sakai, and Falk to the constitutional wrong he has suffered. Summary judgment was therefore appropriate as to these defendants. *Leer v. Murphy*, 844 F.2d at 633–34; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). The state maintains that Defendants Paaga and Lee are immune from suit. It is true that government officials performing discretionary functions enjoy a qualified immunity insofar as their conduct does not violate statutory or constitutional rights of which a reasonable person should have known. *See Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738. As indicated by our discussion above, we believe a reasonable official would have

known that a regulation that forbids communication in a foreign language does not forbid prayer. Thus, the state cannot assert the defense of qualified immunity based on uncertainty in the law or the law's application to this case.

Nevertheless, Defendants Paaga and Lee may still be entitled to qualified immunity. The proper question is whether, at the time of the challenged conduct, a reasonable official would have understood that the actions of Defendants Paaga and Lee violated Conner's rights. *Anderson v. Creighton*, 483 U.S. at 640–41, 107 S.Ct. at 3039–40. Thus, if a reasonable official would not have realized that Conner was praying but could have thought that he was simply communicating with humans regarding earthly subjects, Defendants Paaga and Lee would be entitled to qualified immunity. On remand, the district court should consider whether Defendants Paaga and Lee are entitled to qualified immunity on this basis.

### 4. *Denial of Access*

■■■ While Conner does not explicitly state a claim for denial of access to the courts or to legal materials, the allegations in his affidavits make out such a claim and allege that Defendants Sandin, Oku, Shohet, Gonsalves, Lee, Paaga, and Marshal are responsible for his deprivation.[10] That Conner

---

9. We indicate no view regarding the constitutionality of such a proscription.

10. In his affidavit of April 30, 1988, for example, Conner states that Defendants Sandin, Oku, Shohet, and Gonsalves deprived him of access to legal materials by directly or indirectly "withholding legal case cites from plaintiff which he ordered from the law library which had led to more delays by the law library who refused to permit plaintiff to borrow material because previously sent material had not been returned." In an affidavit of February 2, 1989, written on toilet paper, Conner swears:

> 3. That I have been arbitrarily denied my legal papers when defendants agents Brian Lee, and William Paaga have confiscated my great writ of habeas corpus, and then tor out exhibits i.e. a request form w/Brian Lee denying me to have my Koran; and copies of a callendar which I was going to use to show this court copies of the same callendar that Brian Lee confiscated from my cell, which posed *no* threat to the security etc. and of

which was being used to mark the dates when I sent out legal mail, and to keep the dates of religious matters; and also a motion for a preliminary injunction which was written on the back of a grievance form because I had no paper to write with; and 8 sheets of paper that I constructed with a piece of yellow paper and staples and used as an index for my legal papers; and also that everytime I come back from the law library Brian Lee and/or William Paaga always confiscates something from or all of my legal papers with no assurance of when my papers would be given back; also I have request on this 2nd day of February 1989 to go through my legal papers which were taken from my cell in October 1988, but was not allowed to, plaintiff suspects that these papers are missing—all 6 inches of it.

> 4. That I am not given an entire writing tablet when I request for it, that I would have to wait at lease one week before I receive a writing tablet, and that if I am not given a writing tablet tomorrow 2–3–89 it will be at lease Monday 2–6–89 before I can expect a writing tablet.

gave the wrong name to his injury should not bar him from obtaining relief. *See Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *United States v. Bigman*, 906 F.2d 392, 395 (9th Cir.1990).

■ Conner has a fourteenth amendment right of access to an adequate law library or to persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). Although the facts that Conner alleges are somewhat sketchy, he has presented enough to defeat the state's motion for summary judgment.[11]

· The facts Conner alleges as to Defendants Oku, Shohet, and Gonsalves are conclusory, and therefore fail. The facts he alleges as to Defendants Sandin, Lee, Paaga, and Marshal are not conclusory, and these defendants possess no qualified immunity. Summary judgment on this issue as to these defendants is therefore reversed.

### 5. Review of Confinement

Conner argues by reference to *Sims v. Falk*, No. 88-0348-DAE (D.Ha.1989), that he has been denied meaningful periodic review of his confinement in the maximum security portion of the prison.[12] However, his affidavit in support of his contention is conclusory.

5. That in mid-January I was made to wait at least one week before I got a writing tablet, for which I made (3) requests for, and that so far I have made two requests this week for a writing tablet. 1-30-89 and 2-1-89.
6. That on this 2nd day of February 1989 I made a request to have (4) sheets of writing paper and was not given any.
7. That on 1-24-89 I was only permitted use of my pen for (2) hours from 7:30 pm till 9:30 pm; that on 1-29-89 I was denied a pen with ink; that on 1-30-89 after being told the previous day to do, I request to have a new pen and was denied for (4) hours and told to use my old pen which had *no* ink; that I have never been able to use my pen till 10:00 pm because the defendants agents come in at 9:30 pm or 9:45 pm and collect my pen as they lock-down before going home.
8. That all these acts described above by defendants and their agents causes plaintiff great frustration for which is hard for plaintiff to control.

In his affidavit of February 14, 1989, Conner states that Defendant Marshal twice confiscated a total of seven case citations and also confiscated a Shepard's "How To" manual. He additionally states that Defendant Sandin "confiscated 8

Without supporting facts, we are required to hold that summary judgment was properly granted on this issue.

### 6. Possession of Written Rules

Conner argues, again by reference to *Sims*, that due process entitles him to retain a copy of the written rules that set the standard against which inmates' behavior is judged within the prison. He states in an affidavit that he has not been given a copy of such rules. The prison contends that Conner has been furnished with a copy of the *Inmate Handbook*. A question of material fact thus exists as to this contention. However, Conner has not proximately connected any of the defendants to the loss he claims to have suffered. Therefore, his argument fails. *Leer v. Murphy*, 844 F.2d at 633-34; *Taylor v. List*, 880 F.2d at 1045.

### 7. Legal Status of the Segregation and Maximum Custody Program

.Conner contends that the existence of the Segregation and Maximum Custody Program ("Program") has violated his right to due process because the Program was never correctly authorized by the Director of the Department of Social Services or the Governor

inmate request forms from a manila envelope that was sent to me by the law library staff via 'confidential legal material' process." He stated that none of these materials has been returned to him. ·

11. The state claims that Conner is barred from contesting this issue because of a district court order in *Utu v. Falk*, 935 F.2d 277 (Order re Pretrial Issues). However, the *Utu* order explicitly excluded individual claims for damages, and it merely deferred claims for declaratory and injunctive relief in this case and others until *Utu* was decided. Because *Utu* was settled in April, 1992, it does not impede Conner's suit for declaratory and injunctive relief.

12. The district court in *Sims*, assessing the same claim made against several of the same defendants (Falk, Oku, and Shohet) regarding the same portion of the same prison, held that such confinement was punitive rather than classificatory in nature, and issued a preliminary injunction that ordered the prison to review Sims' confinement not less than every thirty days and to permit Sims to meaningfully participate in the review. The complaint was later dismissed by stipulation.

of Hawaii. He asserts that § 17–200–1 and Haw.Rev.Stat. § 353–3 create a liberty interest in not being subject to any law not explicitly authorized by the governor, that the Program lacks the signatures required by the statute, and that without the signatures the Program does not have the force of law.[13]

Whether or not the Program was approved by the director or the governor, and whether or not the conjunction of § 17–200–1 and Haw.Rev.Stat. § 353–3 creates a liberty interest, Conner's claim fails. The Program was implemented in 1981, according to an affidavit of Defendant Shohet, while § 17–200–1 did not become effective until October 6, 1983. Therefore, § 17–200–1 does not govern the Program and cannot create a liberty interest.

In addition, Conner appears to argue that the Program is invalid because it does not comply with the Hawaii Administrative Procedures Act. Conner's argument appears to make a state claim. Such claims are barred in § 1983 suits. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984). Summary judgment on this issue is affirmed.

### 8. *The Program as a Behavior Modification Program*

Conner argues that the Program is invalid because its policy of providing privileges for good conduct is a behavior modification program of the type rejected in *Canterino v. Wilson,* 546 F.Supp. 174 (W.D.Ky.1982), *as amended,* 562 F.Supp. 106, *aff'd,* 875 F.2d 862 (6th Cir.1989), *cert. denied,* 493 U.S. 991, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989). *Canterino* was decided under an eighth amendment theory. Construing Conner's complaint and affidavits liberally, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *United States v. Bigman,* 906 F.2d at 395, we conclude that Conner contends that the prison's behavior modification program is so unnecessarily restrictive as to constitute cruel and unusual punishment.[14]

Conner alleges that Defendants Falk, Sakai, Oku, and Shohet are responsible for the deprivation he contends he has suffered. His contention fails as to Defendant Falk because his affidavit is made on information and belief, not on the personal knowledge required by Fed.R.Civ.Proc. 56(e). *See Taylor v. List,* 880 F.2d at 1045 n. 3. His claim fails as to Defendants Sakai, Oku, and Shohet because he neglects to set forth facts that proximately connect them with the constitutional injury he contends they inflicted. *Id.* at 1045; *Leer v. Murphy,* 844 F.2d at 633–34.[15]

---

13. Section 17–200–1 states:
   This subtitle shall govern the corrections division of the department of social services and housing, State of Hawaii. Each individual facility may adopt rules governing its unique situation pursuant to Chapter 353, subject to the approval of the director of the department of social services and housing and the governor.
   The version of Haw.Rev.Stat. § 353–3 in effect when the Program was implemented provided that
   [t]he director of social services and housing ... may make and from time to time alter or amend rules relating to the conduct and management of [the state correctional] facilities and the care, control, treatment, furlough and discipline of persons committed to his care, which rules must be approved by the governor....

14. In his affidavit of March 6, 1989, Conner states that the most restrictive non-disciplinary confinement within the Program is virtually identical to disciplinary segregation, *see Canterino,* 546 F.Supp. at 184; that an inmate is permitted to move to a less restrictive environment only after completing a set number of days free of misconduct and that a single act of misconduct erases all the accumulated days and forces an inmate to begin at the beginning, *see id.* at 187; that the Program, as administered, leaves Conner "edgy often, argumentative, and frustrative," *see id.* at 184, 186; and that no written criteria are made available to him so that he will know what behavior is required in order to move to less restrictive environments, *see id.* at 187. In his affidavit of December 26, 1989, he alleges that, while he is confined in the most restrictive prison environments, he is denied periodic reviews of his confinement; allowed inadequate exercise time; and denied permission both to receive newspaper articles, brochures, books, and magazines through the mail, and to contest the rulings of those who censor his mail.

15. Conner claims, for example, in an affidavit dated December 26, 1989, that Defendants Oku and Shohet "are liable for depriving [him] of adequate exercise and recreation when they subject [him] to 22 hours of punitive isolation." Assuming without deciding that twenty-two hours of punitive isolation constitutes cruel and

Additionally, Conner asserts that the Program violates Haw.Rev.Stat. § 465(2), which requires those who practice psychology to be licensed. Such a contention presents a state law claim, which is barred under *Pennhurst,* 465 U.S. at 121, 104 S.Ct. at 919.

### 9. 106 Minor Misconduct Warnings

Conner claims that he was harassed by prison officials through numerous 106 warnings. These are written citations that in themselves lead to no disciplinary action but the accumulation of which may lead to disciplinary segregation. :

■ Even if such warnings infringe on a protected liberty interest, there is no constitutional violation unless and until the inmate is placed in disciplinary segregation as a result of the accumulated warnings. Conner has not set forth any facts that indicate that the warnings he received resulted in any punishment. Therefore, he has failed to support this claim.

### 10. Retaliation Claim

Finally, Conner contends that the defendants have retaliated against him for his activities as a jailhouse lawyer. However, none of his allegations is supported by an affidavit or verified complaint. Summary judgment on this issue is therefore affirmed.

### B. Conner's Cross–Motion for Summary Judgment

The foregoing discussion makes clear that the only issues on which Conner might be entitled to summary judgment are disciplinary segregation, prayer in Arabic, and denial of access. The state has presented genuine issues of material fact as to each of these claims. The district court's denial of Conner's cross-motion for summary judgment is therefore affirmed.

### II.

The district court's grant of the defendants' motion for summary judgment is reversed on the following issues: the disciplin-

unusual punishment, Conner's contention lacks the specificity necessary to defeat a motion for

ary segregation claim as to Defendant Sandin; the prayer claim as to Defendants Paaga and Lee; and the denial of access claim as to Defendants Sandin, Lee, Paaga, and Marshal. Summary judgment is upheld on all other claims and as to all other defendants. The district court's denial of Conner's motion for summary judgment is affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**